## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

TROY ADAMS,

       Plaintiff,

       v.

NANCY A. GIROUX, et al.,

       Defendants.

CIVIL ACTION NO. 1:15-cv-01321

(CONNER, J.)
(SAPORITO, M.J.)

## REPORT AND RECOMMENDATION

This is a *pro se* prisoner civil rights action. The plaintiff asserts federal civil rights claims under 42 U.S.C. § 1983 against several defendants arising out of a prison assault that occurred on January 13, 2014, at SCI Albion, located in Erie County, Pennsylvania. He seeks damages and injunctive relief from the defendants: Nancy A. Giroux, superintendent of SCI Albion; "SCI Albion Security," an organizational subunit of the prison; Linda Traut, food services manager at SCI Albion; David Zetwo, deputy superintendent for facility management at SCI Albion; Michael Clark, deputy superintendent for centralized services at SCI Albion; Barry Smith, major of the guards at SCI Albion; James Becker, a food service worker at SCI Albion; Stacey Hinton, food services sergeant at SCI Albion; Laura Giles, employment coordinator at SCI

Albion,[1] Andy Roach, food services sergeant at SCI Albion; John Wetzel, secretary of the Pennsylvania Department of Corrections ("DOC"); and Dorina Varner, chief grievance officer for the DOC.

## I.   BACKGROUND

The plaintiff, Troy Adams, filed his *pro se* complaint on or about July 6, 2015. (Doc. 1). In the complaint, Adams alleges that he was assaulted by another inmate in the SCI Albion dining hall in front of scores of other inmates on January 13, 2014. He allegedly reported the incident to various prison officials and filed one or more formal grievances. Other inmates provided witness statements as well. Adams is dissatisfied with prison officials' response to his complaints, including what he considers to be an inadequate investigation by the SCI Albion security staff, inadequate sanctions against the inmate who assaulted him, inadequate medical care that he received in connection with the incident, and an inadequate response to his formal grievances. He seeks compensatory and punitive damages against each of the defendants, as well as injunctive relief (an order that each be fired and directed to repay any salary earned after the

---

[1] Defendant Giles was employed as the superintendent's assistant at the time of the events underlying the plaintiff's complaint.

date of the incident). The defendants filed their answer to the complaint on October 29, 2015. (Doc. 23).

Following discovery, the defendants filed a motion for summary judgment on July 5, 2016. (Doc. 60; *see also* Doc. 61; Doc. 62; Doc. 63). The plaintiff has filed a brief in opposition to summary judgment. (Doc. 68). The matter is ripe for disposition.

## II.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to

support or oppose a motion must be made on personal knowledge, set out
facts that would be admissible in evidence, and show that the affiant or
declarant is competent to testify on the matters stated." Fed. R. Civ. P.
56(c)(4). "Although evidence may be considered in a *form* which is
inadmissible at trial, the *content* of the evidence must be capable of
admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599
(M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d
378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary
judgment, to consider evidence that is not admissible at trial).

## III.   UNDISPUTED MATERIAL FACTS[2]

The plaintiff, Troy Adams, is a state prisoner incarcerated at SCI
Albion. He has been incarcerated there since August 2, 2013. He was
assigned to work in the food service department at SCI Albion from
August 21, 2013, through May 3, 2014.

---

[2] These facts are gleaned from the defendant's statement of material
facts and the documentary evidence submitted in support of it, viewed in
the light most favorable to the non-movant, Adams. Although Adams has
submitted a document styled "Response to the Statement of Facts," his
response generally agrees with the defendants' recitation of facts. It does
not controvert any of the particular facts set forth by the defendants, nor
has Adams pointed to any specific evidence to controvert the evidence
marshalled by the defendants in support of their motion.

Inmate food service workers, including Adams, have a separate time to eat, referred to by Adams as "worker feed." (Doc. 62-3, at 13). During worker feed, the food service workers eat in the prison dining room.

During worker feed on January 12, 2014, Adams was reportedly assaulted by another inmate in the dining hall. No prison staff members were present in the dining hall at the time. Adams went to a table and sat down where two other inmates were seated because there were no other seats available. Shortly after that, another inmate approached and told Adams to move. Adams declined to move and the inmate walked away. Sometime later, the inmate returned, grabbed Adams by the throat and yanked him out of the chair. Adams left the dining room and was approached by the same inmate who had grabbed him. That inmate told Adams not to tell anyone what had happened and threatened him that something more would happen if he did.

Adams wished to return to his cell block, but his identification was being held by a correctional food service instructor, non-party Ms. Kersnick. Adams requested his identification, advising Kersnick that he wanted to return to his cell block because something had happened.

Kersnick took Adams to the office to report the incident to a food

services sergeant, defendant Roach. Adams told Roach what had happened in the dining room, but refused to identify the inmate who had assaulted him because he feared reprisal. Roach permitted Adams to return to his cell block.

Adams did not show his neck, which was "a little" reddened from the assault, to Roach. (*Id.* at 15–16). He was not seen by the medical department for this injury, nor did he request to be seen by the medical department.

Later that same day, Adams submitted a written grievance against "staff," which stated:

> On [January 12, 2014,] at approximately 1445 hours, I was in dining hall two for worker feed. I was staying at the table with two other inmates when another inmate came in there and told me to move. I told him no, when I got to the table, there wasn't anything there holding the spot. He then walked away and then came back and grabbed me by the neck and pulled me from the seat. All of this was in camera shot. I then went to the hallway between [dining rooms] two and three, and he came out to where I was and told me I better not tell on him. This was also witnessed by [three] other inmates.
>
> I then went to Ms. Kersnick, asked for my ID to leave. And she asked what was wrong. I told her and she then took me to the office to tell Mr. Roach what happened. When I spoke to Ms. Kersnick, I said I don't know if my neck is red or not, and she said a little. I was not questioned by anybody from Security or any medical

treatment.

> This was the second time I've been assaulted in this department and staff notified and nothing done to help me. I'm asking for $50,000 in punitive damages, and also a transfer to a safer prison for this staffs' disregard to ensure safety within any of these prisons. I now more don't trust anybody who works for this department. I place this grievance in good faith with the hopes of no retaliation against me from staff or inmates.

(*Id.* at 20–21; Doc. 62-4, at 37). At deposition, Adams clarified that the earlier assault referenced in his grievance occurred five years earlier at another institution, SCI Graterford. (Doc. 62-3, at 23–26). Adams's grievance did not identify the inmate who assaulted him, nor did it identify any witnesses.

The next day, January 13, 2014, Adams submitted a written inmate request to Superintendent Giroux. (Doc. 62-2, at 5; Doc. 62-4, at 40). Adams requested that the superintendent look into the January 12 assault, including the review of any security video footage, because he lacked confidence that the staff members to whom he reported it would follow through and investigate the incident. (*See* Doc. 62-2, at 5; Doc. 62-4, at 40; *see also* Doc. 62-3, at 32–33). That same day, the superintendent responded in writing, advising Adams that: "I will have security speak with you and review the cameras— Please be prepared to discuss the

specifics of the assault." (Doc. 62-2, at 5; Doc. 62-4, at 40).

Nineteen days after the assault, on January 31, 2014, Adams spoke with security staff about the assault for the first time, identifying the inmate who assaulted him as "William Wilbur Loch." (Doc. 62-3, at 21). On April 4, 2014, Adams submitted a second written inmate request to Superintendent Giroux, requesting psychological evaluation and treatment.[3] (Doc. 62-2, at 6; Doc. 62-4, at 39). This second inmate request also included a statement identifying Adams's assailant as an inmate named "Lotz." (Doc. 62-2, at 6; Doc. 62-4, at 39). Inmate records confirm that William Wilber Lotz (JW 0328) was incarcerated at SCI Albion from October 20, 2011, until completion of his sentence on February 20, 2015. (Doc. 62-2, at 3).

On March 12, 2014, the assigned grievance officer completed his investigation and responded to Adams's January 12 grievance, stating:

> On the night of this incident, you went to CFSI Kersnick and told her that you were assaulted in Dining Hall #2. When you were later questioned by CFSS Roach about this incident, you told him nothing. You stated that you would not tell CFSS Roach who the Inmate was who assaulted you. You also told CFSS Roach that you did not

---

[3] On April 7, 2014, the superintendent responded: "I will request that Psychology see you ASAP." (Doc. 62-2, at 6; Doc. 62-4, at 39).

> want to tell him who assaulted you because you were
> afraid of what else might happen. We viewed footage
> from the cameral and this showed no evidence of what
> you stated occurred on 1/12/14. Though later[,] when
> Captain Irwin questioned you about the incident in
> Dining Hall #2, you did inform him what had happened
> and who assaulted you. When the Dietary Department
> was notified of whom the individual was that assaulted
> you, he was removed from working in Dietary. We were
> going to move you to a different shift, but with the
> individual being removed from Dietary[,] you have been
> left on 2nd Shift.

(Doc. 62-4, at 38).

On March 18, 2014, Adams appealed the grievance officer's decision
to the facility superintendent. (Doc. 62-4, at 32). In his written appeal,
Adams named two inmate witnesses—Satterfield and Confer—for the first
time. (*Id.*). On March 27, 2014, Superintendent Giroux responded,
upholding the grievance officer's determination and stating:

> I have reviewed your grievance, grievance officer's
> response, and your appeal. In your appeal you state that
> you were moved to F Unit where the individual that
> assaulted you is housed. You have requested to speak
> with Psychology and no one has seen you. None of this
> was brought up in your grievance.
>
> Your grievance was responded to appropriately. The
> other individual was removed from Dietary. In your
> appeal you do not state who the individual is; therefore, I
> will forward to Security for information. If the individual
> remains on your block, he will be moved. Mr. Reilly,
> Psychology Manager, will be made aware of your need to

be seen.

(Doc. 62-4, at 36).

On April 15, 2014, Adams appealed the superintendent's decision to the chief grievance officer for the DOC. (Doc. 62-4, at 33–34). On July 16, 2014, Chief Grievance Officer Varner responded, upholding the superintendent's determination and stating:

> You state that on 1/12/2014 you were assaulted by another inmate in the dining hall #2. You say that when you asked Ms. Kersnick for your identification so you could leave, she asked you what was wrong so you told her. You state that she took you to the office to tell Mr. Roach what had happened. You say that you told Ms. Kersnick that you didn't know if your neck was red or not and she said that it was a little. You claim that you were not questioned by anyone from the Security Office and you did not receive medical treatment. You claim that this is the second time you have been assaulted in the dining area and nothing was done to help you. You request $50,000 in punitive damages and a transfer to a safer prison because of the staff's disregard to ensure inmate safety. You claim that you don't trust anyone who works in that department.
>
> A review of the record found that when you informed Ms. Kersnick of the alleged assault, she took you to see CFSS Roach. However, when CFSS Roach attempted to find out what happened, you would not cooperate and refused to tell him anything including who had assaulted you. Later[,] when Captain Irwin questioned you, you did provide him with answers including who had assaulted you. Since you did provide a name to Capt. Irwin, the inmate who you claim assaulted you was removed from

his kitchen job[.] The Grievance Officer and CFSS Roach reviewed camera footage of 1/12/2014 and found that it did not substantiate your allegations. Issues not brought up in your initial grievance will not be addressed at final review. This office upholds the decisions of the Grievance Officer and Facility Manager in denying your grievance and all requested relief.

(Doc. 62-4, at 30).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

The defendants have moved for summary judgment on the ground that Adams failed to exhaust available administrative remedies before filing suit. In particular, they contend that Adams failed to properly exhaust available administrative remedies because his initial grievance failed to name any of the defendants other than Roach.

Before bringing a § 1983 action concerning prison conditions, a prisoner must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."). "[I]t is beyond the power of this court . . . to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000). Moreover, § 1997e(a) requires "proper"

exhaustion of administrative remedies, meaning strict compliance with DOC deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 89–95 (2006). "A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *McKinney v. Kelchner*, No. 1:CV-05-0205, 2007 WL 2852373, at *3 (M.D. Pa. Sept. 27, 2007) (citing *Spruill v. Gillis*, 372 F.3d 218, 227–32 (3d Cir. 2004)). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'—rules that are defined not by [§ 1997e(a)], but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford*, 548 U.S. at 88) (citation omitted); *see also Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002) ("Section 1997e(a) does not delineate the procedures prisoners must follow."). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not [§ 1997e(a)], that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. "The only constraint is that no prison system may establish a requirement inconsistent with the federal policy

underlying § 1983 and § 1997e(a)." *Strong*, 297 F.3d at 649. Thus, it

follows that "grievances must contain the sort of information that the

administrative system requires." *Strong*, 297 F.3d at 649. But,

> if prison regulations do not prescribe any particular
> content for inmate grievances, "a grievance suffices if it
> alerts the prison to the nature of the wrong for which
> redress is sought. . . . [T]he grievant need not lay out the
> facts, articulate legal theories, or demand particular
> relief. All the grievance need do is object intelligibly to
> some asserted shortcoming."

*Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (quoting *Strong*, 297

F.3d at 650).

In adopting DC-ADM 804, the DOC has established a multi-stage

administrative remedy process through which an inmate may seek formal

review of "problems or other issues arising during the course of their

confinement." (Doc. 62-4, at 2). As the Shambaugh Declaration

summarizes it, DC-ADM 804 provides a three-tiered grievance process: (1)

an initial review by a grievance officer; (2) an appeal to the facility

superintendent; and (3) an appeal to the statewide chief grievance officer.

(*Id.* at 2–6). DC-ADM 804 sets forth various substantive and procedural

requirements for inmate grievances, including requirements that the

initial grievance "identify individuals directly involved in the event(s),"

that it "specifically state any claims . . . concerning violations of [DOC] directives, regulations, court orders, or other law," and that it specifically request any "compensation or other legal relief normally available from a court." (*Id.* at 3, 13).

The defendants contend that Adams failed to properly exhaust his administrative remedies with respect to most of the defendants because his initial grievance failed to mention any of them by name, except Roach. But the prison grievance policy requires only that the inmate "identify individuals *directly* involved in the event(s)." (*Id.* at 13 (emphasis added)). None of these defendants are alleged to have had any direct involvement in the assault at issue. Rather, it appears to allege that the defendants failed to take appropriate steps to protect Adams in advance of this assault by another inmate, failed to provide him with adequate medical treatment after the assault, and failed to adequately investigate the incident or punish the assaultive inmate. The only prison staff members *directly* involved in the facts alleged in the grievance are those named in it— defendant Roach and non-party Kersnick—and neither of them is directly involved in the assault itself. Each of the other defendants is alleged to have had an indirect role, at best.

## B. Adams's Substantive Claims

The plaintiff has asserted federal civil rights claims against the defendants under 42 U.S.C. § 1983. Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

Primarily, the defendants are alleged to have failed to adequately investigate the incident and hold the assaultive inmate, Lotz, accountable

for his misconduct. Adams also claims that defendant Clark failed to provide medical treatment to Adams after the assault. Adams further claims that defendant Hinton failed to take appropriate steps to protect him from the assaultive inmate, Lotz. Finally, Adams claims that defendant Varner improperly refused to permit him to broaden the scope of his inmate grievance to include issues beyond those originally stated in his initial grievance. On the record before the Court, viewed in the light most favorable to Adams, the non-moving party, the defendants are entitled to judgment as a matter of law.

### 1. Failure to Investigate

Adams contends that defendants Giroux, "SCI Albion Security," Traut, Zetwo, Smith, Becker, Giles, Wetzel, and Roach failed to adequately investigate the January 12, 2014, incident and failed to punish the assaultive inmate to Adams's satisfaction. When Adams identified his assailant to prison officials, they ensured that the assaultive inmate was removed from the food services department and transferred to another cell block, but Adams remains dissatisfied because Lotz was not subjected to disciplinary sanctions. But regardless of the defendants' response, it is well-established that "there is no constitutional right to the investigation

or prosecution of another." *Sanders v. Downs*, 420 Fed. App'x 175, 180 (3d Cir. 2011) (per curiam); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."). Accordingly, on the record before the Court, viewed in the light most favorable to Adams, the non-moving party, it is clear that the defendants are entitled to judgment as a matter of law with respect to the plaintiff's claims concerning their alleged failure to investigate and punish the inmate-assailant, Lotz.

## 2. *Failure to Provide Medical Treatment*

Adams contends that defendant Clark failed to provide him with adequate medical treatment following the assault. Liberally construed, this appears to be an attempt to assert an Eighth Amendment deliberate indifference claim. *See generally Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a court's obligation to liberally construe *pro se* pleadings and other submissions, particularly when dealing with imprisoned *pro se* litigants).

The Eighth Amendment to the United States Constitution provides

that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment protects prisoners from cruel and unusual punishment, including "the unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). To prevail on an Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively sufficiently serious; and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). There are different standards for Eighth Amendment violations depending on the type of claim. An Eighth Amendment challenge to prison conditions such as this is subject to the deliberate indifference standard. *See id.* at 835–36. Prison officials are deliberately indifferent when they know of and disregard a substantial risk of harm to a prisoner. *Id.* at 836. Moreover, a prisoner must produce evidence of serious or significant physical or emotional injury resulting from the challenged prison condition. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

> To be liable on a deliberate indifference claim, a defendant prison official must both "know[] of and disregard[] an excessive risk to inmate health or safety." The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the

> excessive risk; it is not sufficient that the official should
> have been aware. However, subjective knowledge on the
> part of the official can be proved by circumstantial
> evidence to the effect that the excessive risk was so
> obvious that the official must have known of the risk.
> Finally, a defendant can rebut a prima facie
> demonstration of deliberate indifference either by
> establishing that he did not have the requisite level of
> knowledge or awareness of the risk, or that, although he
> did know of the risk, he took reasonable steps to prevent
> the harm from occurring.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quoting and citing *Farmer*, 511 U.S. at 837–38, 842, 844) (citations omitted) (alterations in original).

To state a cognizable Eighth Amendment claim for improper medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "This standard is two-pronged. It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978).

With respect to the serious medical need prong of the *Estelle* standard, a serious medical need exists if failure to treat such condition would constitute a "denial of the minimal civilized measure of life's

necessities." *Farmer*, 511 U.S. at 825.

> [T]he concept of a serious medical need . . . has two components, one relating to the consequences of a failure to treat and one relating to the obviousness of those consequences. The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."

*Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting

*Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326,

347 (3d Cir. 1987)).

With respect to the deliberate indifference prong of the *Estelle* standard, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients. *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). "[M]ere allegations of malpractice do not raise issues of constitutional import." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). A mere difference of opinion between the prison medical staff and the inmate regarding the diagnosis or treatment received by the inmate does not constitute deliberate indifference. *Id.* at 346; *Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). Moreover, a prison doctor's use of a

different treatment regimen than that prescribed by a private physician does not amount to deliberate indifference. *Johnson v. Cash*, 557 Fed. App'x 102, 104 (3d Cir. 2013) (per curiam) (citing *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977)). "While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). The key question is whether the defendant provided the inmate with some type of treatment, regardless of whether it is what the plaintiff desires. *Farmer*, 685 F. Supp. at 1339. The complaint must allege that the defendant "knows of the prisoner's need for medical treatment but intentionally refuses to provide it, delays necessary medical treatment for a non-medical reason, or prevents a prisoner from receiving needed medical treatment." *Lopez v. Corr. Med. Servs., Inc.*, 499 Fed. App'x 142, 146 (3d Cir. 2012).

Here, Adams has failed to adduce any evidence of deliberate indifference by Clark, nor evidence of a serious medical need. There is nothing in the record to suggest that Clark was subjectively aware of any injury to Adams, much less of a serious medical need—indeed, Adams

never requested to be seen by medical. Moreover, the injury described by Adams in his pleadings and at deposition amounted to nothing more than a minor abrasion to his neck, causing "a little" redness. Minor injuries do not constitute a "serious medical need." *See Stankowski v. Farley*, 251 Fed. App'x 743, 748 (3d Cir. 2007) (per curiam) (cuts requiring no more than small bandages); *see also Moreno-Vigo v. Berkihiser*, No. 1:14-CV-02229, 2016 WL 374451, at *9 (M.D. Pa. Feb. 1, 2016) (minor abrasions); *Freeman v. Northumberland Cty.*, Civil No. 3:10-CV-2502, 2012 WL 715276, at *6 (rash and other minor injuries of short duration); *Valdez v. Warren Cty. Corr. Dep't*, Civil Action No. 06-cv-03714 (FLW) (JJH), 2007 WL 3243925, at *4 (D.N.J. Nov. 2, 2007) (minor abrasions).

Accordingly, on the record before the Court, viewed in the light most favorable to Adams, the non-moving party, it is clear that the defendants are entitled to judgment as a matter of law with respect to the plaintiff's Eighth Amendment deliberate indifference claim against Clark.

### 3. *Failure to Protect*

Adams contends that defendant Hinton failed to take appropriate measures to prevent the assault that occurred on January 12, 2014. Liberally construed, this appears to be an attempt to assert an Eighth

Amendment failure-to-protect claim. *See generally Mala*, 704 F.3d at 244–46.

The Eighth Amendment imposes "a duty upon prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer*, 511 U.S. at 833) (internal quotation marks omitted). To establish a failure to protect claim, an inmate must demonstrate that: (1) he is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison official acted with "deliberate indifference" to his health and safety. *Farmer*, 511 U.S. at 834. To be deliberately indifferent, a prison official must both "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. This standard is subjective, not objective, "meaning that he official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol*, 256 F.3d at 131.

Here, there is no evidence whatsoever in the record to establish that Adams articulated any threat of serious harm made by Lotz, or that he made multiple complaints about Lotz to any of the defendants. *See Jones v. Beard*, 145 Fed. App'x 743, 745 (3d Cir. 2005) (per curiam). Indeed, at

deposition, Adams testified repeatedly that the defendants had no prior knowledge that the assault would happen. (*See, e.g.*, Doc. 62-3, at 30). Although Adams testified that he had advised Hinton in October 2013 that he "was having a couple problems with a couple inmates," those inmates he identified did not include Lotz, nor is there any evidence in the record to connect them to this assault. (*Id.* at 27).

Accordingly, on the record before the Court, viewed in the light most favorable to Adams, the non-moving party, it is clear that the defendants are entitled to judgment as a matter of law with respect to the plaintiff's Eighth Amendment failure-to-protect claim against Hinton.

### 4. Failure to Consider Issues on Grievance Appeal

Adams contends that defendant Varner failed to permit him to broaden the scope of his grievance, declining to address any issues not raised in his original grievance forms. Liberally construed, this appears to be an attempt to assert a procedural due process claim of a sort. *See generally Mala*, 704 F.3d at 244–46. But it is well-established that "a prisoner has no free-standing constitutional right to an effective prison grievance process." *Woods v. First Corr. Med. Inc.*, 446 Fed. App'x 400, 403 (3d Cir. 2011) (per curiam); *McKeithan v. Beard*, 322 Fed. App'x 194, 201

(3d Cir. 2009) (per curiam); *see also Speight v. Sims*, 283 Fed. App'x 880, 881 (3d Cir. 2008) (per curiam) ("The existence of a prison grievance procedure confers no liberty interest on a prisoner.") (quoting *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (brackets omitted)). Accordingly, on the record before the Court, viewed in the light most favorable to Adams, the non-moving party, it is clear that the defendants are entitled to judgment as a matter of law with respect to Adams's due process claim against Varner concerning the grievance process.

## V.   RECOMMENDATION

For the foregoing reasons, it is recommended that:

1.   The defendant's motion for summary judgment (Doc. 60) be **GRANTED**;

2.   The Clerk be directed to enter **JUDGMENT** in favor of the defendants and against the plaintiff; and

3.   The Clerk be directed to **CLOSE** this case.

Dated: December 15, 2016        *s/ Joseph F. Saporito, Jr.*
                                JOSEPH F. SAPORITO, JR.
                                United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

TROY ADAMS,

   Plaintiff,

   v.

NANCY A. GIROUX, et al.,

   Defendants.

CIVIL ACTION NO. 1:15-cv-01321

(CONNER, J.)
(SAPORITO, M.J.)

## NOTICE

NOTICE IS HEREBY GIVEN that the undersigned has entered the

foregoing Report and Recommendation dated December 15, 2016. Any

party may obtain a review of the Report and Recommendation pursuant to

Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a motion
> or matter described in 28 U.S.C. § 636(b)(1)(B) or making
> a recommendation for the disposition of a prisoner case
> or a habeas corpus petition within fourteen (14) days
> after being served with a copy thereof. Such party shall
> file with the clerk of court, and serve on the magistrate
> judge and all parties, written objections which shall
> specifically identify the portions of the proposed findings,
> recommendations or report to which objection is made
> and the basis for such objections. The briefing
> requirements set forth in Local Rule 72.2 shall apply. A
> judge shall make a de novo determination of those
> portions of the report or specified proposed findings or
> recommendations to which objection is made and may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


Dated: December 15, 2016                    ***s/ Joseph F. Saporito, Jr.***
                                            JOSEPH F. SAPORITO, JR.
                                            United States Magistrate Judge